**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASSOCIATED STUDENTS OF THE UNIVERSITY OF CALIFORNIA AT SANTA BARBARA, and GRADUATE ASSEMBLY OF THE ASSOCIATED STUDENTS OF THE UNIVERSITY OF CALIFORNIA AT BERKELEY<br><br>      Plaintiffs,<br><br>  v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA and ROBERT DYNES, President,<br><br>      Defendants.<br>                              / | No. C 05-04352 SI<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

On January 22, 2007, the Court heard argument on the parties' cross-motions for summary judgment. Plaintiffs are student governments on two University of California campuses, and they challenge a UC policy which prohibits UC student governments from using student fees collected by the University to campaign for or against state ballot initiatives. The Court concludes that the University's limitation is not constitutionally impermissible and will GRANT summary judgment in favor of defendants.

**BACKGROUND**

Plaintiffs, the Associated Students of the University of California at Santa Barbara ("ASUCSB"), and the Graduate Assembly of the Associated Students of the University of California at Berkeley ("ASUCBGA"), are "student government associations created by and for their respective student

bodies." Amended Compl. ¶ 4.

On November 8, 2005, the state of California held a special election on eight ballot initiatives. On October 6, 2005, ASUCSB took a unanimous position in opposition to one of these initiatives, titled Proposition 76.[1] It also passed a resolution allocating $1,000 of student funds to print flyers and educate voters about the perceived negative effects the proposition would have on higher education.

Based upon general University of California ("UC") policies, UCSB's administration refused to disburse the $1,000 from the student fee accounts. The administration claimed that such a disbursement would have violated Section 66.00 of UC's Policies Applying to Campus Activities, Organizations, and Students ("UC Campus Policies"), which provides in relevant part: "[S]tudent governments may not use University resources to support or oppose a particular candidate or ballot proposition in a non-University political campaign." Declaration of Christopher M. Patti in Opposition to Application for Temporary Restraining Order ("Patti Decl."), Ex. 2.

ASUCSB then filed this suit, claiming that defendants had violated its First Amendment rights under color of state law in violation of 42 U.S.C. § 1983, and seeking declaratory and injunctive relief. On October 31, 2005, the Court heard argument on plaintiff's application for a temporary restraining order, which would have enjoined defendants from enforcing Section 66.00 of the UC Campus Policies. The Court denied plaintiff's application.

ASUCSB subsequently filed an amended complaint for declaratory relief, in which ASUCBGA joined as a plaintiff. According to the amended complaint, ASUCBGA passed a resolution on September 16, 2004, allocating $500 to support Proposition 66.[2] As in the case of ASUCSB, defendants' threat to enforce Section 66.00 led ASUCBGA to refrain from spending any of the funds it had allocated to support Proposition 66.

Plaintiffs' amended complaint seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), that defendants' policies prohibiting the use of student fees for student government advocacy for or

---

[1] Among other things, Proposition 76 would have given the governor the power to unilaterally limit or cut certain appropriations. Voters defeated the proposition by a 24.6% margin.

[2] Proposition 66 would have limited California's "Three Strikes" law to violent or serious felonies. Voters defeated the proposition by a 5.4% margin.

2

1  against ballot initiatives violates the United States Constitution.  The parties have now filed cross-
2  motions for summary judgment.

**LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'" *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir.), *cert. denied*, 479 U.S. 949 (1986).

On cross motions for summary judgment, the burdens faced by the opposing parties vary with the burden of proof they will face at trial.  When the moving party will have the burden of proof at trial, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-488 (1984).  In contrast, a moving party who will not have the burden of proof at trial need only point to the insufficiency of the other side's evidence, thereby shifting to the nonmoving party the burden of raising genuine issues of fact by substantial evidence. *T.W. Electric*, 809 F.2d at 630 *citing Celotex*, 477 U.S. at 323; *Kaiser Cement*, 793 F.2d at 1103-04.

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The

evidence the parties present must be admissible.³ Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2nd Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980). The party who will have the burden of proof must persuade the Court that it will have sufficient admissible evidence to justify going to trial.

## DISCUSSION

**1.    The Regents are immune from suit, because they are not "persons" within the meaning of 42 U.S.C. § 1983**

Plaintiffs bring this suit pursuant to 42 U.S.C. § 1983, which creates a right of action against "[e]very person" who, acting under color of law, violates a federal right. As a preliminary matter, defendants move the Court to dismiss all claims against defendant "Regents of the University of California" because the Regents are not "persons" within the meaning of 42 U.S.C. section 1983. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 64 (1989) (holding that state entities are not "persons" subject to suit under section 1983); *Armstrong v. Meyers*, 964 F.2d 948, 949 (9th Cir. 1992) (holding that the Regents "is an arm of the state for Eleventh Amendment purposes, and therefore is not a 'person' within the meaning of" § 1983). In their reply brief, plaintiffs concede that the Regents are not "persons" under 42 U.S.C. § 1983. *See* Pl.'s Reply 2:4-9. For these reasons, the Court hereby DISMISSES all claims against defendant Regents of the University of California.

**2.    Whether plaintiffs are units of the University**

The first of three central issues underlying the instant cross-motions is whether plaintiffs are official sub-units of the University, or whether they are independent student organizations. Defendants

---

³The Court OVERRULES plaintiffs' objections to evidence as moot. None of the evidence plaintiffs object to is relied on by the Court in deciding this motion. The Court also OVERRULES defendants' objections to plaintiffs' evidence, as moot; the evidence objected to is only relevant to issues decided in defendants' favor.

4

argue that plaintiffs are official sub-units, and are therefore governmental entities. Governmental entities, defendants contend, have no independent First Amendment rights. *See, e.g., Demery v. Arpaio*, 378 F.3d 1020, 1032-33 (9th Cir. 2004) (rejecting argument that sheriff, acting in official capacity, had cognizable First Amendment rights). Plaintiffs argue that they are not official sub-units of the University; they are independent student organizations. As independent student organizations, plaintiffs contend they are fully protected by the First Amendment. *See Board of Regents of the Univ. of Wisconsin v. Southworth*, 529 U.S. 217, 235, 120 S. Ct. 1346, 1357 (2000) (distinguishing student speech from speech of university); *First Nat'l Bank*, 435 U.S. at 776, 98 S. Ct. at 1415.

The parties cite, and the Court finds, no case law establishing the legal standard by which to determine whether an entity should be considered a "government entity" or "governmental sub-unit" for First Amendment purposes. Furthermore, none of the cases cited by the parties is on point. Defendants urge the Court to follow *Smith v. The Regents of the University of California*, 4 Cal. 4th 843 (1993), and to find that, as a matter of law, plaintiffs are units of the University. Though defendants fail to so indicate, the passage of *Smith* they quote in support of this argument comes from the dissenting opinion. *See id.* at 890 (Arabian, J., dissenting) ("the ASUC is clearly a creature of the university"; "Thus, the ASUC plainly acts under the authority and close supervision of the Regents and the University."). The majority opinion draws no such conclusion, and decides issues which, though related, do not help resolve the issue presently before this Court. *See id.* at 847.

Plaintiffs also argue that the Court should decide this issue as a matter of law, citing a different case, *Associated Students of the University of California at Riverside v. Kleindienst*, 60 F.R.D. 65 (C.D. Cal. 1973). In *Kleindienst*, the Associated Students, along with several other plaintiffs, brought an action against the United States Attorney General seeking injunctive relief against the enforcement of a federal statute regulating the mailing of birth control and abortion information. *See id.* at 66. The Regents subsequently filed a motion with the district court to intervene and dismiss, on the grounds: "[t]hat plaintiff Associated Student of the University of California at Riverside is a sub unit of The Regents of the University of California and has no independent existence and no power to file legal actions." *Id.* at 66 (quoting Regents' motion).

The Riverside Associated Students argued that they had capacity to sue pursuant to Federal Rule

5

of Civil Procedure 17(b), which provides that "a partnership or other unincorporated association . . . . may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States . . . ." The district court thus addressed the issue of whether the Riverside Associated Students were an "unincorporated association." The district court applied the federal law definition of "unincorporated association," which is "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective." *Id.* at 67 (quoting case). With little discussion of fact, the court concluded that "[t]he Associated Students clearly comes within these definitions of an 'unincorporated association,'" and therefore "clearly has capacity to sue in this action." *Id.* at 67-68.

While *Kleindienst* reaches issues much more closely related to the issues in this case than *Smith*, it still does not control this Court's resolution of whether plaintiffs are governmental entities or independent student groups. The district court in *Kleindienst* found only that the Associated Students were an "unincorporated association" for purposes of Rule 17(b); it did not decide whether the Associated Students were an arm of the state.

The Court is left, therefore, with very little guidance to determine whether plaintiffs are official sub-units of the University. The Court need not, however, make this difficult determination; the following issue is dispositive, regardless of whether plaintiffs are official sub-units of the University.

**3.    Plaintiffs have no constitutional right to spend public money for ballot initiative campaigning**

Defendants argue that even if plaintiffs are not units of the University of California, they have no constitutional right to spend student fees, which are public money, for ballot initiative campaigning. *See Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right."). In response, plaintiffs make two arguments. First, they argue that while the government may be free to impose values-based restrictions on funds distributed out of the public treasury, student fees, as well as tuition and other expenses imposed by the University on students, are not public funds because they are not raised from the public. Student fees, plaintiffs argue, "are not taxes and are neither collected nor

6

distributed pursuant to statute." Plaintiff's Mot. 13. The Supreme Court's holding in *Regan*, however, was simply that the state's failure to subsidize certain types of speech did not constitute a violation of First Amendment Rights. *See* 461 U.S. at 546. The Court's holding did not turn on the source of the money constituting the subsidy. The issue is not where the government funds originate, but whether they in fact belong to the government. The parties do not here dispute that the Regents are an arm of the state government. Article IX, section 9 of the California Constitution establishes the UC system, over which it grants the UC Regents "full powers of organization and government." Cal. Const. Art. IX, § 9. California courts have recognized that the UC Regents is a "statewide administrative agency." *Ishimatsu v. Regents of the Univ. of Cal.*, 266 Cal. App. 2d 854, 864 (Cal. App. 1968); *cf. Southworth*, 529 U.S. at 221, 120 S. Ct. at 1350 (recognizing that the University of Wisconsin is a state government organization). Thus if the student fees belong to the Regents, they belong to the government, and consequently the Regents' decision to disburse those funds constitutes a subsidy, and *Regan* applies.

Plaintiffs next argue that the student fees here at issue never belong to the Regents. The student fees were initially imposed by the plaintiffs, they argue, and are controlled by the plaintiffs. As plaintiffs' Verified Amended Complaint alleges,

> As a matter of administrative convenience, UC collects student fees along with a variety of other student payments, including tuition, room and-or board, parking fees and others. Although UC handles collection of student fees, the fees belong exclusively to the ASSOCIATED STUDENTS. REGENTS have no authority to allocate, modify, or eliminate these fees.

¶ 16. However, plaintiffs present scant evidence of such an arrangement. The declarations of William Shiebler, the External Vice-President for Statewide Affairs of the ASUCSB, and Joshua Rosen Daniels, President of the ASUCBGA, each state, without independent evidentiary support, that plaintiffs impose the fees on the students, the fees belong to plaintiffs, and the Regents have no power or control over use or allocation of the fees. *See* Shiebler Decl. ¶¶ 3-5; Daniels Decl. ¶ 6. In his deposition, Mr. Shiebler also states, again without pointing to any corroborating evidence, that the Regents "don't get to decide the amount of the Associated Students fees." Shiebler Depo. (Brott Decl.), Exh. B at 72:18-19.

Plaintiffs also cite to the Legal Code of the ASUCSB. Patti Decl. Exh. F. The Code, however, only establishes procedures by which the ASUCSB may spend its funds. It mentions student fees only once, stating: "Operating monies are those monies which are collected from A.S. fees during each fiscal

7

year, and those monies in A.S. General Accounts." *Id.* at 19. Plaintiffs cite to no specific passage, and the Court finds none, which suggests that the student fees belong solely to the ASUCSB, rather than the Regents. In fact, the strongest evidence contained in the Code favors defendants; it states: "A.S. Funds shall be spent in accordance with University and Campus Regulations." *Id.* If the ASUCSB maintained sole control over their funds, as they claim, it is curious that they would so limit their autonomy.

Plaintiffs next point, generally, to the Constitution of the Berkeley ASUC. Patti Decl., Exh. I. This document similarly provides little, if any, support for plaintiffs' arguments. The most relevant clause the Court and find states: "The Senate may initiate changes in student fees paid to the ASUC, *subject to* a referendum of the students of the University of California at Berkeley and *approval by the Regents*." *Id.* at 9 (emphasis added). The only reasonable inference that can be drawn from this section is that the Regents have the ultimate say in any change to the student fees paid to the ASUC.

Plaintiffs also direct the Court to section 83.00 of the University of California Policies Applying to Campus Activities, Organizations, and Students. Patti Decl., Exh. B. Again here, the Court finds no support for plaintiffs' assertion that they have complete control over student fees. Section 83.00, titled "Exceptions to the Referendum Requirement," provides certain situations in which student fees may be increased without student referendum. *See id.* Plaintiffs want the Court to infer from this section that because student referenda are generally required for increases in student fees, student fees are not under control of the Regents. However, section 84.20 provides that: "All student referendum results are advisory to the Chancellor and, conditional on the Chancellor's recommendation, are subject to final approval by the President under the authority delegated to the President by The Regents." *Id.* Changes in student fees are therefore subject to approval by both the Chancellor and the President in all circumstances, and in some situations, can be made, unilaterally and without student approval, by the Regents, the President, or the Chancellor. This strongly suggests that the Regents have control and authority over the student fees they eventually transfer to plaintiffs.

Even more telling is a document entitled "Associated Students of the University of California; University of California, Berkeley; ASUC Commercial Activities Agreement," (the "Agreement") dated March 19, 1998. Patti Decl., Ex. L. The Berkeley ASUC and the University apparently entered into the Agreement to resolve a large amount of outstanding debt owed by the ASUC to the University. *See id.*

at 1758, 1778. Exhibit G to the Agreement, entitled "Memorandum of Understanding," ("MOU") provides the best evidence in the record of the precise relationship between the ASUC, the University, and the student fees here at issue. The MOU states, in pertinent part:

> WHEREAS *the Chancellor is empowered by The Regents* to authorize student governments on the campus and *to impose and collect mandatory student activity fees for the support of student government from students attending the University*; and,
>
> WHEREAS the Chancellor has recognized the ASUC as the authorized student government on the Berkeley campus of the University; and
>
> WHEREAS said mandatory student activity fees have been imposed and collected by the University at the Berkeley campus under the direction of The Regents since 1955; and,
>
> WHEREAS the ASUC has been the recipient of the mandatory student activity fees collected by the University since 1955;
>
> NOW THEREFORE, the parties hereto agree as follows:
>
> . . . .
>
> 2. The University agrees to continue the collection of said mandatory student activity fees, so long as they are authorized by The Regents, from students at each period of student registration and to disburse same to the ASUC for the support of authorized student government activities at the University.
>
> 3. In consideration for University collection and transfer of said mandatory student activity fees to the ASUC, the ASUC agrees to continue to be responsible for the operation, management and control of student government and student activities at the University funded by said mandatory student activity fees, and to abide by all University and ASUC rules and regulations governing the use of said mandatory student activity fees, and to abide by constitutional requirements and limitations.
>
> . . . .
>
> 5. . . . . Said amount [of fees] may only be increased by The Regents and the University pursuant to established procedures for fee alterations set forth in published University policies, rules and regulations.

*Id.* at 1796-1797 (emphasis added).

Nowhere does the MOU mention or even suggest that the ASUC at some point granted the Regents the authority to collect the fees. Nowhere does the MOU mention or even suggest that the Regents simply collect the money for the ASUC as an administrative convenience. The plain language of the MOU — that the "Chancellor is empowered by The Regents to . . . impose and collect mandatory student activity fees for the support of student government from students attending the University," that "mandatory student activity fees have been imposed and collected *by the University* at the Berkeley

9

campus *under the direction of The Regents* since 1955," and that "the ASUC has been the *recipient* of the mandatory student activity fees collected by the University since 1955," — thus strongly, if not definitively, shows that the student fees collected by the Regents belong to the Regents.

The California Supreme Court's decision in *Smith*, discussed above, supports this conclusion. *See* 4 Cal. 4th at 843. The court held in *Smith* that the Associated Students' use of mandatory student activity fees, collected by the Regents, to fund political and ideological groups, violated the constitutional rights of freedom of speech and association of students who opposed the views of such groups. *See id.* To protect the rights of these students, without completely prohibiting the funding of political and ideological groups, the court required the Regents to establish procedures "to identify any groups that are ineligible for mandatory funding under the constitutional standards set out above and offer students the option of deducting a corresponding amount from the mandatory fee." *Id.* at 863. In reaching this holding, the court described the authority by which the Regents collect mandatory student fees, stating:

> Plaintiffs . . . contend that the Regents do not have sufficient authority to collect a mandatory student activities fee. The contention lacks merit. The California Constitution expressly invests the Regents with "full powers of organization and government" over the University. (Cal. Const., art. IX, § 9, subd. (a).) This general grant of power, which has been described as giving the Regents "virtual autonomy in self-governance" (*Regents of University of California v. City of Santa Monica* (1978) 77 Cal.App.3d 130, 135), is plainly adequate to permit the Regents to levy a student activities fee in the absence of a constitutional or statutory prohibition.

*Id.* at 851. The California Supreme Court thus clearly stated that the California Constitution gives the Regents the authority to collect mandatory student fees, some of which the Regents then pass on to the Associated Students. Nowhere does the court suggest, as plaintiffs here contend, that the Associated Students gave the Regents the authority to collect the student fees on their behalf.

If the student fees were collected by the Regents and transferred to plaintiffs as a matter merely of administrative convenience, surely plaintiffs would be able to point to some evidence of an agreement establishing this arrangement. Plaintiffs present no evidence of when, where, or how the Regents agreed to "handle collection" of the fees on behalf of the ASUCs, or when, where, and how the Associated Students "delegated to *defendants* the task of collecting" the fees. Pl. Mot. 7:4. The unsupported statements of two student leaders is insufficient to raise a triable issue concerning ownership of the fees.

The Regents have presented ample evidence that they control the fees; that they have the power to raise the fees, and that they have the power to collect the fees. Putting aside all of the evidence discussed above, the mere fact that students paying the fees make checks out to "The Regents of the University of California," *see* Kolling Decl. ¶ 4(a), creates a presumption that the fees belong to the Regents. Plaintiffs have failed to present any evidence, other than conclusory statements, to rebut this presumption.

The Court therefore concludes that there is no genuine issue as to the fact that the student fees collected by the Regents and passed to the plaintiffs, belong to the Regents. As such, under *Regan*, the Regents' decision to not fund the plaintiffs' ballot activity is simply a "decision not to subsidize the exercise of a fundamental right [which] does not infringe the right." 461 U.S. at 549.

**4.     Express, written agreements to comply with University policies**

Defendants also argue that plaintiffs voluntarily relinquished their free speech rights by agreeing to abide by University policies. Plaintiffs do not dispute that individuals and groups can voluntarily relinquish otherwise concrete constitutional rights. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 57 (1976) (holding that though mandatory expenditure limits violate the free speech rights of political candidates, "Congress may engage in public financing of campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations.").

Here, plaintiffs have explicitly agreed to abide by University regulations. The ASUCSB by-laws provide, for example, that "A.S. funds shall be spent in accordance with University and Campus regulations." Article IV, § 1(F) (Patti Decl., Ex. F). The MOU discussed above states: "In consideration for University collection and transfer of said mandatory student activity fees to the ASUC, the ASUC agrees to . . . abide by all University and ASUC rules and regulations governing the use of said mandatory student fees . . . ." Patti Decl., Ex. L at 1796-1797.

In response, plaintiffs argue that by generally agreeing to abide by University policies, the plaintiffs did not knowingly, intentionally, and voluntarily waive their first amendment rights. A waiver of a fundamental constitutional right requires "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The Court agrees with plaintiffs. The

11

Regents did not promulgate Section 66.00 and its restrictions on speech until July 28, 2004, well after the plaintiffs agreed to abide by UC policies. Plaintiffs' agreement to do so therefore could not have constituted "an intentional relinquishment or abandonment" of their Constitutional right to free speech.

**5. When plaintiffs engage in ballot advocacy, they are speaking in their independent capacity as citizens, and thus enjoy full speech rights**

Plaintiffs' final argument is that when they "engage in ballot advocacy, they are speaking in their independent capacity as citizens, and thus enjoy full speech rights." This argument is irrelevant to the issue the Court must here decide. The Court need not determine whether the plaintiffs can speak for against ballot initiatives; it only decides that the University is not required to subsidize such speech.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion for summary judgment [29], and DENIES plaintiffs' motion for summary judgment [#37].

**IT IS SO ORDERED.**

Dated: January 23, 2007

SUSAN ILLSTON
United States District Judge